My name is Jeffrey Squire from Brigger, Wexler, Eagle, and Squire, with me is my colleague David Stone and Mark Bedino of Glancy, Binkham, and Goldberg from Los Angeles. I'd like to reserve four minutes for rebuttal. This morning I plan to discuss two reasons that this case should be of interest to this Court, and then discuss five serious errors in the District Court's order and decision of December 7th, 2010. We're all non-smokers, by the way. So am I. If time permits, I'll turn to Promissory Staple and the California claims. The first reason this case should be of interest is that it provides the opportunity to clarify the law applicable to consumer loyalty programs. There is no Federal appellate decision that considers whether loyalty programs should be treated only as advertisements or should be treated as a binding agreement, a contract. No Federal appellate court has written on this issue. The second reason that this case should be of interest is that consumer loyalty programs affect tens or hundreds of thousands of consumers. American Express, United Airlines, American Airlines, Delta, Hilton, Marriott, Hertz, Avis, Macy's, Bloomingdale. I don't think, Counsel, you want to waste your time on that line of argument. We're interested in every case because they're of importance to the parties and   And we're interested in every case because they're of importance to the parties and the consumers. And believe me, I've got more than enough to write as Judge Moonen and Judge Miller. I'll follow your understanding. He's got 1,200 per-judge weighted cases, you know, so. Thank you. I'll turn now to the five serious errors in the district court's opinion. The first error was its holding that a loyalty program was only an advertisement. According to the district court, a loyalty program provides no rights or property, but like an advertisement, it is only an invitation to make an offer. However, the loyalty programs say, I think fairly, by choosing to select and purchasing that particular company's products or services, consumers will receive not only the products purchased, but also obtain, can obtain additional valuable products or services. But wasn't the Court looking at your pleadings? Yes. And it was in light of those pleadings that the Court was reaching that conclusion. So help me understand why, after Iqbal and Twombly, the pleadings aren't too conclusory. You know, to say it's like the frequent flyer programs and lists several criteria without going into the details, for example, of the enrollment documents or the catalogs, why is that not too conclusory? Because I think on a contract claim, you only have to plead a contract. You don't, the laws lead to that. You don't have to plead every term of the contract. And this is not a fraud claim. It's not a 9B standard. It's a notice pleading standard. So I think we provide more than sufficient notice as to what the contract is. Does each C-note begin a new contract? No. All right. No. The first C-note that someone collects. Well, here's what we understand the contract is. People submit an application to the company, to RJR. RJR accepts the application and then issues the consumer a particular number for the program. The company also sends a catalog that states the specific merchandise available, the number of points or coupons needed to redeem for that merchandise, and the procedures the consumer needs to follow to receive the merchandise. Consumers then spend their money and buy that particular company's products. The consumers accumulate points or coupons to redeem for things of value. And the last thing that happens is the consumer attempts to redeem the coupons or points and get merchandise. So we believe the contract occurs when someone applies to join the program, is accepted, gets a number, gets a catalog with all the detailed information in it. And we believe the district court erred when it just focused on the last step, Step 7, but did not consider the six prior steps, which, when taken together, constitute a contract. More importantly, the district court never considered Steps 1 through 4 that I just referred to, where to start this, someone has to apply, be accepted, get a number, and get the information. That is very different, as my experience and understanding is, from an advertiser. The district court erred when it held that loyalty programs provided no rights and no properties were only invitations to make an offer, which, at any time for any reason, the company was completely free to reject. And the Court held this as a matter of law. The second error in the district court's opinion was that this was a unilateral or a bilateral contract. I think it's a – in the Reynolds unrelated with Philip Morris case, the judge there says it could be a unilateral contract. But I believe ours is a bilateral contract because, in the Reynolds case, I don't think this application procedure occurred. Well, what's the promise on the part of the consumer that's enforceable in any way? It – the consumer sort of has an option. I think that's – the consumer – You mean once you get your number, you're obligated to keep buying cannabis cigarettes? No. No, obviously not. No. The consumer – the consumer's promise is if the consumer seeks to redeem the coupons or points, it will follow the procedures. So the second error committed was that when the district court attempts to distinguish the frequent flyer cases, none of the frequent flyer cases hold that those loyalty programs are not contracts. Also, in the Southern District in Reynolds, which I just referred to, found with regard to the Marlboro Miles program that there was a unilateral contract between the parties. So there was an issue of fact as to that. Also, then.. In the Wolins case, did the frequent flyer program allow unilateral amendment? I believe so. I believe so. I believe that the frequent flyer cases agreements say they can change the terms at any time. And the issue there was whether they changed them retroactively or not. Not that.. There's more recent cases. The Continental Airlines case, which points out that the airline reserves the rights to change the terms. And last year, this court, in reversing a dismissal under 1286 in Ginsburg v. Northwest, held that a breach of contract claim was not barred by the Airline Deregulation Act, so that a claim for breach of the implied covenant of good faith and fair dealing was not preempted. And as the district court opinion here recognized, for a claim based on a breach of the implied covenant, there must first be a contract. So what.. Let's say you prevail on the.. That there's the elements of a contract. What's the enforceability? How does one measure? On the face of the invitation to create this offer, the C, that is the C note, says the value is one one-thousandth of one cent. So that's the value of the C note. I don't believe that statement is correct. Well, I'm reading it. One slash one thousandth of one. I understand. But I think there's some federal regulation or state statute that says for these coupons they have to have a nominal value. Okay. So that doesn't set the value of the contract? It's only the value of the piece of paper? Absolutely correct, Your Honor. The value, we think, is determined by RKR's own statistics. RKR is a huge, multibillion-dollar company. And if they do this promotion, I can guarantee the court, they have very good statistical estimates of how much this is going to cost them. And we have submitted some of those. Well, how does that get translated out? There's, what is it, ER 142, for example, is their potential C note exposure. Is that the value that you're using? Yes, I believe it is. 14 cents or 13 cents? Whatever it is, that's the value of the outstanding camel cash. It varies from time to time. Now, the catalog that they, once they gave their notice in, what was it, 2006? Right. Okay. And then they didn't print a new catalog. Right. Okay. So is what you're saying that it doesn't make any difference what was in the catalog as to the kind of merchandise that any individual might opt to get? Your theory is that each of the C notes was worth 15 cents. Well, something like that, although, yes, I would say, yes, that's right. Based on RKR's estimate, whatever that comes out to, that would be how much the C notes would be worth. Okay. So the district court found, it made factual findings on a motion to dismiss with regard to the frequent flyer programs, that they were different from camel cash because frequent flyer programs involve consumers who joined and signed agreements. But that was a factual error. Fairly read, paragraphs 4, 27, and 30 say that for camel cash, consumers were required also to sign up, be accepted, and were provided with the procedure they must follow, and that the company would provide merchandise throughout the duration of the program. The district court also erred when it tried to distinguish frequent flyer cases, in particular, Frequent Flyer Depot, which said that an airline's performance under these agreements established consideration, rendering those agreements enforceable. The district court said RKR didn't provide consideration because RKR never accepted plaintiffs' offer to issue merchandise. But then later on, at the end of its opinion, said, in dismissing the CLRA claim, that RKR had a long history of honoring its camel cash program. We're not, I believe the Court understands, we're not claiming about a particular item or a particular redemption. We're talking about the whole program. And RKR performed in accepting applications, issuing numbers, and in redeeming merchandise until six months before it said the program would end. Third, the district court also erred when it relied principally on two cases, Allagart and Leonard v. PepsiCo, to hold loyalty programs or just advertisements. Those cases are readily distinguishable. Allagart involved a claim that the program could not be terminated. PepsiCo involved a television advertisement, which the Court says, said was evidently done in jest. And neither, in neither of those two cases, they were like coupon clipping cases. Neither in those two programs was the consumer required to apply, provide information, get, have the application be accepted, and get a number. Are you asking for a remand and the ability to proceed on the third amended complaint? Yes. As pled? Yes. I'm going to stop now. All right. Thank you. Thank you. Good morning. Good morning. May I please the Court? My name is John Vogt. I represent R.J. Reynolds Tobacco Company, the respondent in this case. The first, I just have one housekeeping item. About a week ago, appellant's counsel filed a letter with the Court calling Judge Houston's decision on the, and it was the Reynolds v. Philip Morris case, and then it also attached this Court's decision vacating, reversing Judge Houston's decision. That case has been dismissed with prejudice, and it was done voluntarily by the plaintiff, where it says, in light of a recent decision by this Court, plaintiff has decided to dismiss the case with prejudice. So that case is no longer active. I didn't know if this Court knew that or not. But that was the one housekeeping item. Okay. I appreciate that. No problem. What was the case? Which case again? It was a letter that counsel. Yeah. Just the name of the case. Oh, the name of the case is Reynolds, no relation to R.J. Reynolds Tobacco. Reynolds. The last name of the plaintiff, versus Philip Morris, USA. It's case number 3-0-5-01876. And it was reversed at 332 Federal Appendix 397. Okay. Thank you. You're welcome. And in reversing Judge Houston, you know, this Court found that the Marlboro Miles was a promotional program, an advertisement, and that the Marlboro Miles were This was a mem dispo? I beg your pardon? This opinion, reversing, was a mem dispo? It was a mem dispo. I wouldn't rely too heavily on mem dispos. They're citable. And it found, quote, that the Marlboro Miles attached to Philip Morris's packs of Marlboros is a, quote, unquote, proof of purchase, just like a cereal box top or an Ovaltine label. But let me focus my argument. This is a breach of implied covenant case in search of a contract. Judge Schneider did not err when she dismissed plaintiff's Third Amendment complaint of prejudice. Every claim is defective, and plaintiffs have had four chances to plead a cognizable claim. Nor has plaintiffs accused that Judge Schneider prejudged this case. Nor did Judge Schneider ignore allegations. You know, we don't pay attention to attacks on district courts. Okay. As Judge Mueller will attest. That's fine. So you don't need to worry that talking about that will affect your argument. This is an interesting contract question. Why isn't this really like a frequent flyer program, given all of the steps that are involved here? Each contract turns on its own facts. Every case that the appellants have cited under frequent flyer context, none of them address contract formation issues. The only case that actually addresses contract formation issues is the frequent flyer depot case. And in frequent flyer depot, the court found that American Airlines' frequent flyer program would not have been a contract. It was unenforceable. But it allowed enforcement for three reasons. The first reason, the court found, was that for tickets that American had already issued for people that turned in their miles and sought a ticket, for those, those were a contract because American Airlines decided to honor it and issue a ticket. It also said for future tickets, if American decides to accept the miles and issue a ticket, then the issuance of a ticket in that circumstance would be a contract. Well, let's talk about this case. Well, the third reason why is American was trying to enforce its contract. And the court said that American does not get to come before us and say we have a contract and then later say we don't. And plus, frequent flyer depot was arguing trying to enforce the contract but at the end of the day, the court said, well, we have a contract and we're going to have their cake and eat it too. Why is it not a contract in this case? It's because there is no obligation on the part of R.J. Reynolds with regard to any particular plaintiff. Plaintiff's theory of contract is by removing a proof of work. But they had individual numbers, didn't they? I think. Yes. The customer who got into this program enrolled by sending in the C-note and getting a number and, as counsel said, then got a catalog. That's correct. Okay. So they bought Camel cigarettes on the assumption that there was a reward program, correct? They bought Camel cigarettes and removed the proof of purchase. And the reason for putting those C-notes on was to encourage sales, and I think there's market data to show that the market share of Camels did rise by about 2%, something like that. Sure. It was an advertisement. Okay. Well, it was an advertisement. In this context, it's a legal conclusion. And in your own internal documentation, there is this ER-142, which actually R.J. R. calculated the value and the potential liability. So apparently internally, and since it's called potential C-note exposure, estimated $32 million liability at end of cash too, it does seem that R.J. R. was treating this as something other than just an advertisement. Wouldn't you agree with that? R.J. R.'s internal documents has no bearing on whether or not a contract was formed. The contract is formed by outward, objective outward manifestations. A person that went to 7-Eleven and purchased a pack of Camels. Now, let's not talk about 7-Eleven. Let's talk about R.J. Reynolds. Counsel on his argument was specific. He said there's an application, there's an acceptance, there's a customer ID number and a catalog that's sent. That's all objective manifestation. Then there's years of performance, which is an objective manifestation. And there's so all, you know, in terms of objective manifestation, there seems to be no question that at least in terms of pleading the case, there is sufficient evidence to create the elements of a contract. And there's a value attached by the obligor, if you will, the promisor, R.J. R., which itself is able to assign a value and treats it as a potential liability. So I don't think it's irrelevant. It goes to a matter of proof. But I agree with you. There has to be objective manifestation. So why isn't what I've recited enough objective manifestation? Because there's no obligation on R.J. R.'s part to do – let me back up. There's no such thing as a class-wide contract. There's no obligation on R.J. R.'s part to do anything with regard to any person that removed a proof of purchase, enrolled in the program, and got a catalog without further communication from that individual. So they send in their application, and they accumulate enough points, and they submit their request, and R.J. R. over the years fulfills those. They make an offer for goods in the catalog, and R.J. R. has, and as they can see, over the first 15 years of the program, honored the terms of the promotion. But that does not mean that an advertising promotion is a bilateral contract. So it's a unilateral contract. They expressly disclaim unilateral contract. They allege that R.J. R. had no obligation to maintain any particular good. You only can have a unilateral contract where the promise is certain and that you can do only one thing and one thing only. For example, Lefkowitz versus the Minnesota Supply Company, where the offer was anyone that comes down at 9 a.m. sharp on a Saturday with a dollar and is one of the first 100 people can get a fur coat. Well, Mars Lefkowitz showed up at the great Minneapolis supply store, dollar in hand, at 9 a.m. on a Saturday to collect his fur. It's akin to a reward case. When you're dealing with advertisements to the public that do not ask for a specific performance, such as in Harris versus Time, open the envelope. In the carbolic smokeball case, use the carbolic smokeball three times a day, and if you contract influenza, you can get 100 pounds, and to show our good faith, we're going to deposit 1,000 pounds in the bank. The plaintiffs here expressly disclaim unilateral contract. They say they have no obligation to the submission of an order. I'm sorry. Where do they disclaim a unilateral contract? I can tell you exactly. This case turns or falls on whether they establish a bilateral contract. They allege bilateral contract. That's not the same thing. Where do they expressly disclaim? I'll read it to you. The Third Amendment Complaint, Paragraph 31, quote, it was not a contract to obtain a specific item or good. In a bilateral contract, that can only be the circumstance. If it's not a contract for a specific, if it's not an offer for a specific item or good, you do not have a bilateral contract. And so that's Harris v. Time. That's Rubio v. Capital One, this Court's opinion in 2010. It's Donovan v. RRL Corp., 26 Cal 4th, 261 at Pennsite 271. As explained in Leonard v. PepsiCo, counsel began his argument saying there's no federal case to address this. Leonard v. PepsiCo, the federal court, the federal district court in New York, said the only exceptions to the rule that advertisements do not create the power of acceptance is where the advertisement is clear, definite, and explicit and leaves nothing open to negotiation. There was no enrollment there, was there? But the plaintiffs, I am not aware of any case that holds that enrolling in an advertising promotion has the talismanic effect of forming a bilateral contract, particularly whereas here it required further communication. It's black-letter law. If further communication is required, there is no agreement. In order for plaintiffs to have any merchandise from RJR, they had to first collect enough C-notes. And this is interesting because they allege that one C-note is not enough. They allege they needed to have at least 100. And so under their theory of contract, Jane Doe can go to 7-Eleven, buy a pack of camels, remove the proof of purchase, call the 800 number, get an enrollment number and a catalog. At that point, RJR has a bilateral contract with Ms. Doe, even though she doesn't even have enough camel certificates to make an order for merchandise in the catalog and that Reynolds would have to presumably indefinitely do what? I don't know. They don't say. They expressly disclaim Reynolds' obligation to maintain reasonable quantities. They say that's an obligation that the duty of good faith and fair dealing imposes. But that presupposes there's a contract. There's no covenant unless there's a contract. If there's no obligation, why announce a termination date six months out? They didn't terminate. The announcement says that the camel cash promotion is terminating and that the C-Notes you have are the last of its kind and they will no longer be included in packs of camels. It's not happening overnight. You'll have until March 2007 to redeem your C-Notes. So in other words, we're going to allow you until the end of March to do it. You come April and try, you're out of luck. But supplies are limited and it wouldn't hurt to get there before the rush. Meaning that, look, whatever we have on hand is what we have on hand. We're going to give you to March, but it's terminating. We're not including C-Notes anymore and govern yourself accordingly. Prior to October 1st, they concede that RJR could have canceled the camel cash program at any time without notice, thus defeating any mutuality of obligation. I mean, because RJR could have terminated without notice and without any obligation to any plaintiff, there is no contract. It fails for lack of mutuality of obligation. It fails because there was no obligation on RJR's part without further communication from the plaintiffs and the sites for, I'm sorry, for mutuality, I wanted to give you the two pin sites. It's County of Alameda versus Ross. That's the California Court of Appeals decision at 32. Calab 2D, 135. Pin sites, 145. Plaintiffs ignored that case. Cowell versus Day holds to the same effect. And so, yes, there's no mutuality of obligation. And the sine qua non of contracts is definiteness. There is no allegation in this case, nor could there be, that RJR was required to maintain any specific items, any specific items for a period of time, maintain certain quantities of goods for any particular period of time. There was absolutely no obligation on RJR's part to do anything absent further communication, which goes to definiteness. Okay. Over time. Okay. Thank you. The supposed defects with regard to the Camel Cash Program are exactly the same as the frequent flyer program. There's no guarantee you'll get a particular seat on a particular day to a particular location. There's no guarantee there will be any quantity of flights available. The company reserves the rights. The airlines reserve the right to change the terms. But no case has held that those reasons make the frequent flyer program not a contract. I'm reading American Airlines v. Wolins and the Supreme Court. American does not suggest its contracts lack legal force. Transworld Airlines v. American Coupon Exchange. Although there are no other appellate decisions addressing the character of the rights embodied by frequent flyer coupons, decisions in analogous areas suggest that these innovations in the travel market evidence rights of contract. Frequent Flyer Depot, in consideration for the advantage members purchasing paid travel on American and its partner airlines and purchasing other services from specified providers, American agrees to provide reward points to those customers. It is nonsensical for appellants to argue that no enforceable agreement exists when their entire business depends on the enforceability of the obligation to issue a ticket. So I don't think that RJR has been able to, in any meaningful way, distinguish the frequent flyer programs. We did not say that we don't think this can be, sorry, it is possible that this is a unilateral contract, as Your Honor pointed out. And that's what the Court found in Mueller. I believe Mueller was only reversed on one issue, which was that the courts held there that the coupons could be gift certificates. And this Court said no. But when you were up here before, you said it was not unilateral. I was wrong. I think I was wrong. We're told there is no class-wide contract. But there is a definite class. This case, we believe RJR and Discovery, we will be able to provide the names and contact information for every member of the program. With regard to Frequent Flyer Depot, we're told that that only relates to particular tickets issued. But that case didn't discuss whether signing up and getting accepted was an offer and acceptance. And also, the Court in Frequent Flyer Depot not only enjoined what was going on at present, but enjoined what was going on in the future. And if there hadn't been a ticket issued, according to RJR, there wouldn't have been no contract. Yet Frequent Flyer Depot was enjoined not only in the present, but in the future. Transworld noted that the rules and regulations were published and filed as tariffs based on the applicable regulations. Is that a key distinction? No. I don't think so. No case has held that if these rules are part of the tariffs and that's a requirement, they'd be a contract. We've cited many of the Frequent Flyer cases we could find, and none of them say that. And lastly, RJR says, well, the internal documents don't matter. It's only the objective manifestations. But if the objective manifestations are subject to differing interpretations, as I believe they are here, then it becomes a question of fact whether the defendant intended to be bound. And it seems to me as to that issue, whether the defendant intended to be bound, if the defendant has admissions in his documents, that's relevant, relevant evidence on the issue of whether RJR did or did not intend to be bound. Whose contract law applies in this case? That's a good question, Matt. No one has suggested it would be other than California. I believe that's RJR's biggest market. Okay. Thank you very much. Thank you. Interesting case. It would be a good law school exam. All right. I think that the early is submitted. And we will take.
judges: Mueller, Noonan, Fisher